MYERS, J.,
for the Court.
STATEMENT OF FACTS
¶ 1. Gary Stewart is an African-American resident of New Orleans, Louisiana, where he has lived his entire life. At the time of his arrest in Louisiana, on bad check charges brought in Mississippi, Stewart was working for both the New Orleans Aviation Board and Office Depot. Stewart lost his job with Office Depot as a result of being arrested and jailed in Mississippi.
¶ 2. Around February 2, 1997, Stewart lost his wallet which contained his Louisiana personal identification card. Stewart reported his identification card as lost and was issued a replacement. The identification card lost had his Social Security number, name, picture, date of birth, expiration date, class title, and class letter. Stewart did not have a driver’s license at the time his wallet was lost.
¶ 3. An unidentified white male found Stewart’s wallet and, using the information contained on Stewart’s identification card, obtained a fake personal identification card using Stewart’s identifying information. The fake personal identification card had a picture of a white male but contained Gary Stewart’s Social Security number and stated the individual’s name as “Gary Stewart.”
¶ 4. The white male used this fake identification card to establish a checking account at Great Southern National Bank in Hattiesburg, Mississippi under Gary Stewart’s name and Social Security number and, using this account, wrote checks in an amount totaling $6,890.42. As a result, grand juries for the January and February 1998 terms of the Second Judicial District of the Circuit Court of Jones County, Mississippi returned indictments against Stewart, on false pretense charges stemming from the bad checks.
*1019 ¶ 5. On January 3, 2000, a new district attorney took office and one' of the tasks the new regime undertook was to try and locate some of the people who were indicted by prior grand juries. One such file was that of Gary Stewart, which contained a photograph of the white male involved in writing the checks, as one of the businesses which accepted an invalid check obtained a copy of the identification card the imposter was using.
¶ 6. Stewart was working at the New Orleans International Airport when he was contacted by his mother. Stewart’s mother informed him that the Louisiana State Police had visited her, leaving a telephone number for Stewart to contact them. Stewart contacted the Louisiana State Police and was informed that they had “received a complaint from Mississippi that somebody was writing checks in [his] name,” and that he needed to come to the station to obtain a new driver’s license number. Stewart by this time had acquired a driver’s license. When Stewart arrived at the Louisiana State Police station, he was arrested for committing false pretenses in Mississippi.
¶ 7. Stewart remained imprisoned in Jefferson Parish, Louisiana, until he was extradited to Jones County. During his ten day incarceration at the Jefferson Parish, Louisiana Sheriffs Office, Stewart alleges that he became ill because he was unable to obtain his insulin medication for, .his diabetic condition.
¶ 8. On March 9, 2000, Stewart had an initial appearance before Circuit Court Judge Billie Joe Landrum on the false pretenses indictments. Stewart was denied bail and his preliminary hearing was scheduled for March 28, 2000. Stewart obtained an attorney and was released on bail on March 14, 2000.
¶ 9. On March 23, 2000, the photo of the imposter was located in one of approximately ten files the 'district attorney’s office had on Gary Stewart. Mel Riley, an investigator for the district attorney’s office, wrote the Mississippi Department of Public Safety requesting a driver’s license photograph of Gary Stewart, with a certain driver’s license number. The Department of Public Safety sent Riley a copy of a photograph of the white male ■ who obtained the fake identification card using Stewart’s personal information. Upon realizing that the wrong individual had been arrested, on March 28, 2000, Judge Land-rum dismissed the false pretense charges against Stewart.
¶ 10. Stewart filed this complaint in the Circuit Court of the First Judicial District of Hinds County on May 16, 2001, against the Department of Public Safety for the State of Mississippi, the District Attorney’s Office for the Eighteenth Circuit Court District, the Jones County, Mississippi Sheriffs Department, the Jefferson Parish, Louisiana Sheriffs Department, and John Does “A” through “Z.” In his complaint, Stewart asserted claims of false arrest, unreasonable seizure, and violation of his due process rights stemming from his unlawful arrest by the defendants. Stewart’s claims against the'Jones County, Mississippi Sheriffs Department and the Jefferson Parish, Louisiana Sheriffs Department were settled prior to trial. Further, Stewart entered an agreed order on January 30, 2002, dismissing the Department of Public Safety for the State of Mississippi and transferring the case to the Second Judicial District of Jones County, Mississippi. The remaining defendant of Stewart’s complaint was the District Attorney’s Office for the Eighteenth Circuit Court District.
¶ 11. Circuit Court Judge Robert G. Helfrich was appointed as special judge to preside over the case, as Judge Landrum had recused himself. The district attorney *1020 filed a motion for summary judgment on Stewart’s claims on March 6, 2003. The court granted the motion on October 31, 2003. Aggrieved by the trial court’s grant of summary judgment against his claims, Stewart appeals raising the following four issues:
I. WHETHER THE TRIAL COURT APPLIED THE PROPER STANDARD IN DETERMINING WHETHER OR NOT SUMMARY JUDGMENT WAS PROPER?
II. WHETHER THE ACTIONS OF THE ASSISTANT DISTRICT ATTORNEY WERE WITHIN THE SCOPE OF HER DUTIES, AND THUS DISCRETIONARY, AND WERE HER ACTIONS OBJECTIVELY REASONABLE?
III. WHETHER THE DOCTRINES OF JUDICIAL IMMUNITY, GOVERNMENTAL IMMUNITY, AND SOVEREIGN IMMUNITY UNDER THE MISSISSIPPI TORT CLAIMS ACT BAR STEWART’S ACTION AGAINST THE ASSISTANT DISTRICT ATTORNEY?
IV. WHETHER THE ACTIONS OF THE ASSISTANT DISTRICT ATTORNEY VIOLATED PLAINTIFF’S CONSTITUTIONAL OR STATUTORY RIGHTS?
¶ 12. Although this case presents a very unfortunate series of events which befell Stewart, this Court finds no reversible error, and therefore we affirm.
LEGAL ANALYSIS
STANDARD OF REVIEW
¶ 13. Stewart essentially raises one key issue, which is whether or not summary judgment was proper, and advances four arguments as to why he contends summary judgment was improper. In addressing Stewart’s positions, we will maintain his arguments as he presents them in order to clearly address each of his contentions. As such, the standard of review for each of the sub-issues, addressed as separate issues, is the same, which is stated as follows:
This Court applies a de novo standard of review to a grant of summary judgment by the trial court. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. Russell v. Orr, 700 So.2d 619, 622 (Miss.1997). A motion for summary judgment lies only when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. M.R.C.P. 56(c). This Court does not try issues on a Rule 56 motion; it only determines whether there are issues to be tried. Townsend v. Estate of Gilbert, 616 So.2d 333, 335 (Miss.1993). The presence of fact issues in the record does not per se entitle a party to avoid summary judgment. “The court must be convinced that the factual issue is a material one, one that matters in an outcome determinative sense ... the existence of a hundred contested issues of fact will not thwart summary judgment where there is no genuine dispute regarding the material issues of fact.” Simmons v. Thompson Mach. of Miss., Inc., 631 So.2d 798, 801 (Miss.1994) (citing Shaw v. Burchfield, 481 So.2d 247, 252 (Miss.1985)).
Leffler v. Sharp, 891 So.2d 152, 156(¶ 9) (Miss.2004).
I. WHETHER THE TRIAL COURT APPLIED THE PROPER STANDARD IN DETERMINING WHETHER OR NOT SUMMARY JUDGMENT WAS PROPER?
DISCUSSION
¶ 14. The proper standard for determining whether or not to grant a party’s *1021 motion for summary judgment is addressed by Rule 56(c) of the Mississippi Rules of Civil Procedure. Rule 56(c) states:
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories,’ and admissions on file, together with the affidavits, if any, ’ show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
¶ 15. In order to adequately address whether or not the trial judge correctly addressed this standard, a brief explanation of the materials which the trial judge relied upon in making his decision is warranted. In its motion for summary judgment, the district attorney contends that Stewart lacks a cause of action in light of the Mississippi Tort Claims Act, as codified by Mississippi Code Annotated §§ 11-46-1 through 11-46-23 (Rev.2002). In support of this contention, the district attorney attached as exhibits the capias issued by the Jones County Circuit Court, the waiver of extradition signed by Stewart, the transcript of Stewart’s arraignment hearing, a copy of Stewart’s bond, the transcript of Stewart’s motion to dismiss, the order releasing Stewart on bond, the deposition of Stewart, and the deposition of Mel Riley, an investigator for the district attorney’s office. In addition to these exhibits, the district attorney attached numerous authorities supporting the position that qualified immunity is applicable under the present circumstances.
¶ 16. The record does not reflect that the trial judge improperly construed the evidence in the light most favorable to the state agency, nor does the record support Stewart’s theory that all reasonable inferences were drawn in the State’s favor. Therefore, it cannot be stated that the trial judge misconstrued the applicable standard in reviewing a motion for summary judgment.
¶ 17. Stewart also argues that the trial court’s grant of the district attorney’s motion for summary judgment was improper in light of Mississippi Code Annotated §§ 25-31-6 (Rev.2003) and 19-25-35 (Rev.2003). Mississippi Code Annotated § 25-31-6 addresses the qualifications, powers and duties, and method of removal for legal assistants to district attorneys and states as follows:
Legal assistants to district attorneys shall be regularly licensed and practicing attorneys having been duly admitted to practice before the supreme court of the State of Mississippi, and shall have the power and authority, under the direction and supervision of the district attorney, to perform all of the duties required of that office. Said legal assistants may be removed at the discretion of the duly elected and acting district attorney, or for cause by the senior circuit judge of the district.
Stewart argues that the assistant district attorney who located his file and passed along his identifying information so that he could be apprehended, exceeded the statutory authority granted to his position. Stewart contends that by passing along this information, the assistant district attorney was acting as a part of the executive branch of government, namely as a sheriffs deputy. Mississippi Code Annotated § 19-25-35 which sets forth the duty of the sheriff to attend courts, incarcerate persons, and to execute orders and decrees, states as follows:
The sheriff shall be the executive officer of the circuit and chancery court of his county, and he shall attend all the sessions thereof with a sufficient number of deputies or bailiffs. He shall execute all orders and decrees of said courts directed to him to be executed. He *1022 shall take into his custody, and safely keep, in the jail of his county, all persons committed by order of either of said courts, or by any process issuing therefrom, or lawfully required to be held for appearance before either of them.
¶ 18. As stated by this statute, the sheriff possesses the power to make arrests. Stewart takes a great leap in logic by stating that the assistant district attorney involved in this matter was functioning as the sheriff or a member of the sheriffs department. In support of this argument, Stewart contends that the United States Supreme Court decision of Burns v. Reed, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), is analogous to the case sub judice. We find Bums to be distinguishable.
¶ 19. In the Bums decision, the Supreme Court found that there is limited immunity for a state prosecutor. In Bums, the state prosecutor gave advice to the local police force stating that a confession which was given under hypnosis was likely enough for probable cause. The prosecutor then participated in the probable cause hearing, in which a search warrant was sought, without disclosing that the confession was induced by hypnosis. The Supreme Court held that the prosecutor’s participation in the probable cause hearing was covered by the prosecutor’s grant of immunity, though the prosecutor’s rendering of legal advice to the police department exceeded the scope of immunity. Although the Bums decision stands for the proposition that one protected by governmental immunity can lose such immunity upon exceeding the scope of his or her responsibilities, Stewart fails to demonstrate how the assistant district attorney in this case has done acts which would be outside of the scope of governmental immunity as codified by the Mississippi Tort Claims Act.
¶ 20. Stewart contends that the assistant district attorney, by referring the name and social security numbers of individuals, against whom indictments had been returned by the grand jury, so that the police might apprehend those individuals, exceeded the authority of her position. Stewart argues that the assistant district attorney was acting as a law enforcement officer by participating in Stewart’s arrest. The record shows that the assistant district attorney did not perform the arrest but, rather, passed on the information contained in the indictments returned against one going by the name of Gary Stewart with the same Social Security number as the Appellant, so that the individual could be apprehended. This information was required by law enforcement so that an arrest could be made, and passing this information along was not beyond the scope of the assistant district attorney’s duties, as her office possessed the indictments. Therefore, this issue is without merit.
II. WHETHER THE ACTIONS OF THE ASSISTANT DISTRICT ATTORNEY WAS WITHIN THE SCOPE OF HER DUTIES, AND THUS DISCRETIONARY, AND WERE HER ACTIONS OBJECTIVELY REASONABLE?
DISCUSSION
¶ 21. In his second argument, Stewart presents the same argument as presented in his first. Stewart argues that by relaying his name and Social Security number to the legal authorities, the assistant district attorney exceeded the powers granted to her by Mississippi Code Annotated §§ 25-31-6 and 25-31-11. Stewart expands on this argument by contending that the office of the district attorney is vicariously hable for the actions of its assistant district attorney and others working within its office, because the actions *1023 taken by the assistant district attorney were not discretionary, as defined by the Mississippi Tort Claims Act in Mississippi Code Annotated § ll-^46-9(l)(d) (Rev. 2002), which states that:
(1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
(d) Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused;....
¶ 22. In support of his argument, Stewart cites the case of Bridges v. Pearl River Valley Water Supply District, 793 So.2d 584 (Miss.2001), which held “[i]n determining whether governmental conduct is discretionary the Court must answer two questions: (1) whether the activity involved an element of choice or judgment; and if so, (2) whether the choice or judgment in supervision involves social, economic or political policy alternatives.” Id. at 588(¶ 15) (citing Jones v. Miss. Dep’t of Transp., 744 So.2d 256, 260 (¶¶ 9-10) (Miss.1999)).
¶ 23. Stewart has misapplied the test set forth in Bridges and Jones. In discussing the first part of this two-part test, Stewart simply alleges:
The statute creating the D.A.’s Office and legal assistants did not contain any authority or direction on assisting in the arrest of persons indicted for crimes. Therefore, the activity that Ms. Lowe and the secretary for the D.A.’s office were involved in[,] ... giving information to law enforcement officers and assisting in the arrest of Gary Stewart[,] were [sic] not an activity that involved an element of choice or judgment.
Stewart then states that although the activity does not involve an element of choice or judgment, assuming the first part of the two-part test was met, that the second part was not met, as “the choice or judgment did not involve social, economic or political party alternatives.” This test is misapplied, as the district attorney is directly charged with performing the conduct complained about which Stewart complains. Miss.Code Ann. § 25-31-11(1).
¶ 24. As stated in Issue I, neither the district attorney’s office nor any of its employees assisted in the actual arrest of Stewart. Rather, Stewart’s identifying information contained in the indictments was given to the law enforcement officers so that Stewart could be apprehended. Mississippi Code Annotated § 25-31-6 (Rev. 2003), authorizes this conduct of the assistant district attorney, of which Stewart complains. Section 25-31-6 states as follows:
Legal assistants to district attorneys shall be regularly licensed and practicing attorneys having been duly admitted to practice before the supreme court of the State of Mississippi, and shall have the power and authority, under the direction and supervision of the district attorney, to perform all of the duties required of that office.
(emphasis added).
¶ 25. It is the direct function of the district attorney’s office to participate in grand jury investigations in accordance with Mississippi Code Annotated § 25-31-13 (Rev.2003). Further, it is a requirement of prosecuting cases that the information contained in the indictments be given to the applicable law enforcement office so that an arrest may be made. It cannot be said that the assistant district attorney operated outside of the scope of her employment, and she is, therefore, entitled to the protections afforded her by *1024 the Mississippi Tort Claims Act. As such, we find this issue is without merit.
III. WHETHER THE DOCTRINES OF JUDICIAL IMMUNITY, GOVERNMENTAL IMMUNITY, AND SOVEREIGN IMMUNITY UNDER THE MISSISSIPPI TORT CLAIMS ACT BAR STEWART’S ACTION AGAINST THE ASSISTANT DISTRICT ATTORNEY?
DISCUSSION
¶ 26. Stewart next separates out as an individualized argument the contention that the assistant district attorney exceeded the scope of duties prescribed to her by statute and is, therefore, no longer protected by the Mississippi Tort Claims Act. Having already addressed this issue, we will not do so again. We have already determined that the assistant district attorney did not exceed the scope of her authority; therefore, this issue is without merit.
IV. WHETHER THE ACTIONS OF THE ASSISTANT DISTRICT ATTORNEY VIOLATED PLAINTIFF’S CONSTITUTIONAL OR STATUTORY RIGHTS?
DISCUSSION
¶27. Stewart last contends that the actions of the assistant district attorney and her secretary violated his Fourth Amendment rights, as they lacked probable cause for his arrest. As stated above, neither of these individuals were involved in Stewart’s actual arrest. Rather, Stewart’s identifying information was given to law enforcement officials so that Stewart could be detained pursuant to the eleven indictments returned against him. Further, upon realizing that the wrong “Gary Stewart” had been arrested, the charges against Stewart were dismissed. As noted by the dissent, upon discovering that the State had arrested the wrong person, the charges against Stewart were not dismissed for several days. Although if this statement is taken at face value, it would appear that Stewart remained incarcerated during this time, but it should be noted that he had been released on bond prior to discovering that the wrong Gary Stewart had been arrested. Further, the hearing did not occur sooner due to Stewart’s scheduled hearing which was quickly approaching. With the fact that Stewart was released on bond awaiting a. scheduled hearing, it cannot be stated that Stewart was harmed by this delay in having the charges dropped.
¶28. As each of the issues raised by Stewart are related, it is now proper to address the Fifth Circuit Court of Appeals decision of Sanchez v. Swyden, 139 F.3d 464 (5th Cir.1998), which addresses the previous issues, as well as the present issue of constitutional and statutory rights. The facts of Sanchez are very close to the facts of the case sub judice. In the Sanchez decision, Oscar Sanchez brought a 42 U.S.C. § 1983 claim against a multitude of public officials, claiming that his twenty six hour detention violated his due process rights.
¶ 29. In August 1992, Sanchez arrived at Houston’s Intercontinental Airport from Mexico and passed through the United States Customs Service. While passing through Customs, an agent matched his name and physical description to a warrant issued from Cheatham County, Tennessee. Due to the outstanding warrant, Sanchez was detained so that Customs could determine whether “Oscar F. Sanchez” was indeed still wanted in Cheatham County.
¶ 30. That evening, the Cheatham County’s Sheriffs Department informed Customs that Oscar F. Sanchez was still wanted and faxed copies of photographs, fingerprint copies, and other identifying *1025 information, which noted the presence of a rose tattoo on Sanchez’s left shoulder, to Customs. The Houston Police Department then took custody of Sanchez pursuant to the authorized “fugitive hold.”
¶ 31. Later that day, Sanchez was brought before a Harris County, Texas probable cause court, where Sanchez refused to waive extradition proceedings. It was during this proceeding that Sanchez proclaimed his innocence, and it was discovered that Sanchez lacked the tattoo as described in the information received from Cheatham County. The judge ordered Sanchez to be held until his identification could be confirmed. Upon comparison of the fingerprints received from Cheatham County and those of Sanchez, it was determined that Sanchez had been improperly detained and he was released. Sanchez then brought a § 1983 action against the numerous individuals involved in his ordeal, alleging that he had been deprived of a clearly established constitutional right and that those involved in detention had acted unreasonably. These are essentially the same arguments presented in the case sub judice.
¶ 32. Without detailing each element of the Sanchez opinion, some points relied upon by the Fifth Circuit in making the decision to grant summary judgment to the defendants warrant discussion, as those same points are applicable in the case before us. First, in determining whether a defendant is entitled to qualified immunity as a matter of law, it must first be ascertained “whether an official’s conduct deprived a ... plaintiff of a ‘clearly established’ constitutional or statutory right.” Sanchez, 139 F.3d at 466. “The constitutional right must be sufficiently clear to put a reasonable officer on notice that certain conduct violates that right.” Id. In this case, the charges against Stewart were immediately dropped upon confirmation that an improper person had been detained.
¶ 33. Though available, the picture of the wanted Gary Stewart was not discovered in the approximately ten files pertaining to Stewart, and this picture was not confirmed with the Department of Public Safety as the information on file until notice was given by Stewart’s attorney. The assistant district attorney’s actions, ■ of which Stewart complains, were based upon the fact that many indictments for a Gary Stewart with a certain Social Security number were in her possession. The district attorney who passed the information along to the Jones County Sheriffs Department was not present at Stewart’s initial appearance and was not involved in his case until the hearing to dismiss the charges. The assistant district attorney would never have had the opportunity to discover that the wrong individual was in custody, as she had no personal encounter with Stewart prior to dismissing the charges.
¶ 34. Although failure to discover the single picture in one of the multiple files may indicate a slight degree of negligence, it cannot be stated that overall, the actions of the assistant district attorney were not objectively reasonable. The Fifth Circuit has stated, “a public official may successfully assert the defense of qualified immunity even though the official violates a person’s civil rights, provided the official’s conduct was objectively reasonable.” Id. Furthermore, as reasoned by the United States Supreme Court, although at times the end result is harsh, the policy upon which immunity is founded is sound. The basis for a grant of immunity is that public officials may become hesitant to fully discharge their professional duties for fear of subsequent litigation. See Pierson v. Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).
*1026 ¶ 35. Although an argument may be made that the district attorney would at a minimum be placed upon constructive notice by the presence of the perpetrator’s photograph in one of the multiple files, when looking at the case as a whole, the district attorney’s negligence was minimal. At Stewart’s arraignment, Stewart never put the court or any of its officers on notice that the improper individual was in custody. The transcript of Stewart’s arraignment is as follows:
THE COURT: Gary Stewart?
[Mr. Stewart approaches the bench]
THE COURT: Gary Stewart, is that you?
DEFENDANT STEWART: Yes, sir.
THE COURT: All right, [sic]
[DEFENDANT DULY SWORN BY THE DEPUTY CIRCUIT CLERK, JOYCE BUSH]
THE COURT: Mr. Stewart, it looks like you are charged with several offenses here of false pretense. Are they all false pretense?
MR. HEDGEPETH: Yes, Your Hon- or.
[QUESTIONS PROPOUNDED THE DEFENDANT BY THE COURT:]
Q. Mr. Stewart, are you represented by an attorney?
A. No, sir.
Q. ' Do you wish to be represented by an attorney on these charges?
A. Yes, sir.
Q. Do you have the money to hire an attorney with?
A. No, sir.
Q. How long have you been in jail?
A. Uhm....
OFFICER MAX DAVIS: Judge, he’s been in our jail since Monday or Tues.day.
A. I believe I came on Monday.
OFFICER MAX DAVIS: He was in jail in New Orleans — Metairie, Louisiana, and we picked him up down there and brought him back.
Q. Do you want to get your own attorney? Is that what you said? Do you have the money to hire an attorney with? Do you have somebody that you want to hire as your attorney?
A. Yeah, I can get one from New Orleans.
Q. From New Orleans?
A. I’ve been trying to get an attorney there.
Q. I don’t think I’m really following you. Are you going to get you an attorney? Are you going to hire you an attorney to represent you on these matters?
A. Yes, I am.
Q. Well, do you want to wait until the attorney gets here before you plead on these matters?
A. Nah, I’ll go on with my plea.
Q. All right. Do you plead guilty or not guilty to all of these offenses before the Court?
A. Not guilty.
Q. All right. You need to get with your attorney because these cases will be set for trial. When is the next trial date?
DEPUTY CLERK, JOYCE BUSH: The next First District date will be July 24.
Q. July 24 will be your trial in Ellis-ville, and the next down here is what?
DEPUTY CLERK, JOYCE BUSH: March 28 for Second District.
Q. March 28. So you need to get you an attorney.
THE COURT: All right.
A. Do I have a bond set?
*1027 Q. Do what?
A. Do I have a bond set?
Q. Have you ever been convicted of a felony before?
A. No.
Q. Where do you live?
A. I live in New Orleans.
Q. Well, your attorney will have to take that up with the Court whenever he gets here. Whenever you get an attorney, he’ll take that up with me about your bond.
THE COURT: All right, [sic]
(emphasis added).
¶ 36. As the transcript demonstrates, Stewart never informed the court, the district attorney, or any official involved in his prosecution that the improper Gary Stewart had been detained. Rather, he waited until he had secured the services of an attorney to bring this fact to light. With this fact in mind, the law clearly states that “neither law nor equity helps or pities one that sleeps on his rights.” Carter v. Spencer, 5 Miss. 42 (4 Howard 42) (1839).
¶ 37. Some of the statements of the dissent require clarification. It’s stated by the dissent that “[w]hile there was a warrant issued for a Gary Stewart, it was a warrant for a white Gary Stewart.” We believe this statement is trying to convey the fact that the individual who was actually wanted pursuant to the capias was the white “Gary Stewart,” the one guilty of the crimes. This sentence can also be misinterpreted to mean that the capias stated that the individual sought was white and yet, a black individual was arrested. It should be noted that race was not present on the capias. Mel Riley testified to this fact as follows:
Q. Since this Gary Stewart who’s sitting here, the African-American Gary Stewart, has been released from those charges, but he was picked up on these indictments, have there been any attempts to have new capiases issued for the white Gary Stewart?
A. I can’t — I can’t answer that. I know capiases wouldn’t have the race on them anyway, so it wouldn’t matter there.
This was further supported by the testimony of Stewart who stated:
Q. Did any of the capias documents, Gary, that you looked at indicated — the capias documents were those documents that they — is this [sic] the documents that they showed you when you were in court — well, excuse me — when you were incarcerated in Jones County? Remember you told me the transportation—
A. (Deponent examining document.) Yeah. This is the — yeah, this is.
[[Image here]]
Q. Did any of those documents reflect the race of the person they were arresting that you recall?
A. Talking about in Jones County?
Q. Yeah.
A. No, I didn’t see no race on here. It just got my name and Social Security number on some of them.
¶ 38. Lastly, the dissent feels that the discrepancy in birth dates from the wanted “Gary Stewart” and the arrested Gary Stewart clearly proves negligence by the district attorney’s office. During Riley’s deposition, he testified that this is not an uncommon event and would not raise a glaring red flag. The applicable portion of Riley’s deposition is as follows:
Q. Could you, Mr. Riley, tell us about that conversation.
A. Okay. What happened, I got a call. I don’t know what time it was. I was asleep. So it was late at night. And I don’t go to bed until about 10, 10:30. *1028 He said — and he was obviously talking to law enforcement on another phone because he said they have Gary Stewart. Do we still want him? And I said, “Well, if that’s the Gary Stewart, yes, if that’s the right one.” He said, well, the birth dates are not the same, but he said the Social Security numbers match up. And I said, okay. Then he said — there’s a pause there for a minute. Then he says, ‘Well, they say this is [sic] got to be him cause he’s doing the same thing down here.” And I said, “Well, if that’s him, bring him to Mississippi then.”
[[Image here]]
Q. When they said that there were two difference Social Security numbers, did you—
A. There was — no, it was not two different Social Security numbers. His date of birth did not match.
Q. Okay. The date of births, excuse me.
A. But that’s not uncommon for us. I can go through the jail roster and pick up the same guy in there with dozens of dates of birth.
¶ 39. Further, the dissent is at a loss as to how the district attorney’s office could allow a person of a different race to remain incarcerated under the charges. As stated previously, Stewart only told the sheriffs officers in both Orleans Parish and Jones County that he had never been to Jones County, Mississippi. Each time he expressed this to the officers, they told him to tell the judge or tell someone who was in a position to remedy the situation. Stewart failed to do this. The only individual who had any indication that there could potentially be a problem was Riley. Riley testified that he never went to see Stewart while he was incarcerated because Riley was aware that Stewart was represented, or soon to be represented, by counsel. Riley stated that he would be unable to speak to Stewart if he was represented so he never had an opportunity to see the individual incarcerated. Riley testified to this fact as follows:
Q. I was going to ask you, between March the 6th and March the 9th, before he had his preliminary hearing, did you attempt to go talk to him?
A. I didn’t attempt to go talk to him because I knew he had an attorney. Once he got in our jail, we found out that he had — he was gonna hire his own attorney, so I never talked to him.
Q. Did you go back and check any of the other files?
A. No. There was no reason to.
Q. You sure you had the right man?
A. At that time I was sure it was the right man.
¶ 40. Based upon Stewart’s actions, and the information known to the district attorney’s office, it cannot be stated that any of the actions taken were unreasonable. With the public policy consideration in mind, which calls for a prosecutor’s ability to practice law without the constant fear of being sued, as well as Stewart’s conduct, to hold the district attorney liable for the actions in this case would be an unjust result. As expressed by the Fifth Circuit, “A constitutional violation does not occur every time someone feels that they have been wronged or treated unfairly.” Sanchez, 139 F.3d at 467 (quoting Shinn ex rel. Shinn v. College Station Indep. Sch. Dist., 96 F.3d 783, 786 (5th Cir.1996)). The case sub judice is one such instance. Therefore, the defense of qualified immunity is applicable and the district attorney’s office has incurred no liability to Stewart.
¶ 41. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY GRANTING SUMMARY JUDGMENT IS AFFIRMED. ALL COSTS OF THIS *1029 APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE, P.J., CHANDLER, GRIFFIS, AND BARNES, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BRIDGES, P.J., AND ISHEE, J.